**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARRIE B. SCOTT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11CV00925 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the
Commissioner's final decision denying Carrie Scott's application for a period of disability and
Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434,
and Supplemental Security Income ("SSI") under Title XVI of the Act, *id*., § 1381-1383f.  For
the reasons set forth below, the decision of the ALJ shall be reversed and the case remanded for
further consideration and, if needed, further development of the record.

Plaintiff, who was born on July 3, 1955, filed an application for disability benefits on
November 30, 2005, alleging a disability onset date on March 15, 2005.  The application was
denied at the initial administrative level on May 30, 2006, and Plaintiff did not seek further
review.  (Tr. 112, 115.)  On October 3, 2007, Plaintiff protectively filed the application that is the
subject of this action, alleging a disability onset date of May 18, 2007, due to depression,
anxiety, and pain in her neck, shoulder, lower back, right forearm and hand, and right hip and
leg.  After an initial denial of benefits, Plaintiff filed a timely request for a hearing before an
Administrative Law Judge ("ALJ"), and a hearing was held on July 15, 2009, at which Plaintiff

was represented by counsel.  On October 9, 2009, the ALJ issued a decision finding that Plaintiff

was not disabled.  On April 12, 2011, after considering additional evidence submitted by

Plaintiff, the Appeals Council of the Social Security Administration denied Plaintiff's request for

further review.  Thus, the ALJ's decision stands as the Commissioner's final decision.  Plaintiff

filed this action for judicial review on May 23, 2011.

## I.      ADMINISTRATIVE RECORD

### A.      Work History

In her application for benefits, Plaintiff represented that she worked full-time doing

billing and collections for various employers, from 1992 to 1996, 1996 to1997, 1997 to 1999,

1999 to 2004, and 2006 to 2007, and then part-time as a receptionist at VMI, a retail

establishment, for two months in 2007.  (Tr. 146-56.)  Plaintiff's earnings fluctuated from

approximately $15,000 in 1997, to a maximum of approximately $30,000 in 2003, to

approximately $6,000 in 2004, with minimal earnings thereafter.  (Tr. 113.)

### B.      Hearing of July 15, 2009

#### 1.      Plaintiff's Testimony (Tr. 25-49)

Plaintiff testified she was not married, but had a boyfriend and one living adult child.

She testified that she had a high school diploma.  Plaintiff stated she lived alone in a one-story

ranch-style house with a washer and dryer in the basement.  She said she had no household

income except food stamps and she received medical care from a free clinic.

Plaintiff testified she last worked as a part-time receptionist for an audio and video

company briefly in 2007.  Her duties included answering the phone, filing, handling purchase

orders, and contacting salespeople.  Plaintiff said she was unable to perform her work

responsibilities because she had difficulty stooping, getting down and back up, and sitting for

long periods of time.  She testified she was "let go," because, in addition to her inability to do the job, she needed three months off for right arm surgery.

Before the receptionist job in 2007, Plaintiff worked in billing and collections for approximately six different companies over fifteen years.  She worked full-time for Precision Technologies for two or three months.  She testified she was "let go" because she completed seventy percent production and ninety percent production was required.  Before Precision Technologies, she worked for another billing and collection company for between one and two months.  She said she was also "let go" from that position because she could not meet production numbers since her depression affected her ability to concentrate.  She worked at two collection agencies for two years each and one for five years.  With the exception of the jobs she left for health reasons, Plaintiff stated she left each job for a better position at a new company.  With the exception of one job, she said the most she ever had to lift was about ten pounds.

Plaintiff used a wheelchair at the hearing because she fell and broke her left ankle during a walk in the park on May 9, 2009.  She had an eight-inch plate, screws, and pins on her left foot's left side, and three pins on the right side.  She stated doctors replaced her cast with a boot and advised her to be very careful with her left leg.  She could use a walker for short distances at home; however, she had to use a wheelchair outside of her home.  Plaintiff testified she expected to start physical therapy upon her doctor's approval.

Next, Plaintiff testified that bone spurs in her tailbone, arthritis, bone spurs in the rotator cuff muscle of her right arm, a bulging disc in her back, spurs in her neck, and depression constituted the medical conditions preventing her from working.  Plaintiff testified that the bone spurs and arthritis caused chronic pain in her tailbone and pain down both of her legs, and her

doctors told her this condition might require surgery in the future.  She testified she took Oxycodone and Lyrica for this pain.

Plaintiff reported a bone spur had cut through her right rotator cuff muscles, which required reparative surgery.  She estimated that the recovery period from the surgery lasted four months.  Her doctor instructed her not to lift anything over ten pounds with her right arm. Plaintiff testified she lost 30 percent use of her right arm and struggled to hold things.  She acknowledged using her right arm when she was sworn in at the hearing.  Plaintiff stated arthritis caused pain in her knees, but acknowledged her knee x-rays were negative.

With regard to the bulging disc in the lower left side of her back, Plaintiff stated she had three injections in her left side to manage the pain from the bulging disc.  She also testified that she had three injections in her neck.  She stated that she had spurs and malformed discs in her neck, but had yet to receive the results of a recent MRI to confirm the diagnosis.  The ALJ mentioned that the preliminary diagnosis was mild cervical spondylosis.

Plaintiff testified her depression stemmed from childhood sexual abuse and her son's death in 1997.  She said she sought counseling in 2005 or 2006 on a weekly basis with social worker Esther Scharf.  She also saw several other rotating therapists.  Although she was being treated for depression, she stated that she experienced difficulty concentrating and remembering "certain procedures" in 2007.  Plaintiff stated she took medications, which caused dizziness, lightheadedness, and drowsiness.  Plaintiff stated that she worked out the grief of her son's death, but she did not have her overall depression "completely under control."  She said she felt like a "misfit" and her family added to her problems; therefore, she avoided them.

Plaintiff testified she had not smoked for the past five years.  She drank "very little" alcohol, and she did not use illegal drugs.  She stated she had a driver's license and drove before

4

she broke her ankle.  She also stated she cooked and loaded the dishwasher.  Before her accident,

she did laundry and vacuumed; her boyfriend mowed her lawn.  Also before the accident, she

could stand or sit for about four hours, and walk between an hour and an hour and a half.

Plaintiff also testified she could lift ten pounds frequently and a maximum of 15 pounds.  She

stated she sometimes woke up in the middle of the night and would dust or do the dishes.

Plaintiff stated she spent approximately six daylight hours each day lying down due to

depression, medication, and family problems.  She said when she was working at her part time

job at VMI, stress and back and neck pain caused her to go straight to bed.  Plaintiff stated she

could follow the rules at work, but had difficulty remembering procedures, meeting production,

and concentrating due to depression, medication, and "racing thoughts."  Plaintiff testified she

would often leave her work station and go to cry in the restroom.

### 2.     Vocational Expert Testimony (Tr. 51-57 )

The VE testified that all of Plaintiff's past work was generally classified as skilled or

semi-skilled sedentary or light work.  He testified that Plaintiff's clerical skills could be used in

other jobs.  The ALJ presented two hypotheticals to the VE.  The first hypothetical to the VE

provided:

> [A]ssume a hypothetical individual [with] the Claimant's education, training, and
> work experience.  Further assume the individual can do light work[1] with the
> following limitations.  Reaching in all directions is limited to frequently with the
> right arm.  She cannot lift with her right arm over her head.  She can understand,

---

[1]  "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than
20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a
good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm
or leg controls.  Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *6, elaborates that the
full range of light work requires standing or walking, off and on, for a total of approximately six
hours of an eight hour work day, while sitting may occur intermittently during the remaining
time; that the lifting requirement for the majority of light jobs can be accomplished with
occasional, rather than frequent, stooping; and that many unskilled light jobs are performed
primarily in one location, with the ability to stand being more critical than the ability to walk.

remember, and carry out at least simple instructions, non-detailed tasks.  She can demonstrate adequate judgment to make simple, work-related decisions.  And she can perform work at a normal pace without production quotas.  Would that individual be able to perform past work?

(Tr. 52-53.)

The VE testified that the production quota limitation would preclude Plaintiff's past relevant work but that the hypothetical person could "perform work at a normal pace without production quotas in terms of transferring skills."  The VE identified the light jobs of school bus monitor, sandwich board carrier, and parking lot attendant as jobs that the individual would be able to perform.  The VE testified that there were 630 school bus monitor jobs, 670 sandwich board carrier jobs, and 1,290 parking lot attendant jobs in the St. Louis metropolitan area.

The ALJ then posed a second hypothetical with all of the factors from the first hypothetical adding the condition that the individual would have up to three absences per month due to a mental condition.  The VE testified that this would preclude competitive employment.  Upon questioning by Plaintiff's counsel, the VE testified that if the individual in the hypothetical was markedly impaired in her ability to complete even simple tasks in a timely manner over a sustained period of time due to a combination of depression and chronic pain, the individual would not be capable of competitive employment, including the jobs identified by the VE.  The VE also testified that if the individual had poor concentration due to racing thoughts, poor sleep, chronic severe pain, and multiple severe stressors, the individual would not be capable of maintaining competitive employment.

C.       **Medical Records**

Medical records and opinions that predate the alleged onset of disability are relevant as background information.  *See e.g., Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008).  In 1992, Plaintiff had thyroid surgery in which 95% of her thyroid was removed.  The results of an MRI on October 7, 2004, were consistent with tendonosis in the supraspinatus[2] tendon.  Plaintiff did not have a full rotator cuff tear, there was no impingement, and the visualized marrow was "essentially unremarkable."  On January 28, 2005, Plaintiff was seen by John Lautenschlager, M.D., at North County Community Health Center ("NCCHC").  Plaintiff complained of severe right shoulder pain, spinal arthritis, and bone spurs that had affected her for three years.  She reported she was interested in grief counseling due to her eldest son's death (in 1997).  Plaintiff described her depression as "feeling sad and nervous."  She reported her depression was related to prolonged grief, difficulty sleeping, financial difficulties, other systemic illness, and recent changes in life.  Plaintiff denied suicidal ideation.  Dr. Lautenschlager diagnosed Plaintiff with depressive disorder, pain in joint involving shoulder region, and postsurgical hypothyroidism.  (Tr. 209-11.)

On February 11, 2005, Dr. Lautenschlager examined Plaintiff regarding her complaints of depression, thyroid problems, and right shoulder pain.  Plaintiff reported that medication was helping her pain and that she was sleeping better.  Dr. Lautenschlager diagnosed postsurgical hypothyroidism, pain in joint involving shoulder region, and depressive disorder not otherwise classified ("NOS").  He noted that she did not want to see a social worker at that time.  Amitriptyline was ordered for nerve pain and depression.  (Tr. 206-08.)

---

[2] Supraspinatus is the intrinsic muscle of the shoulder joint, the tendon of which contributes to the rotator cuff.  Stedman's Medical Dictionary 1157 (27th edition 2000).

On February 23, 2005, Plaintiff visited Dr. Lautenschlager to review recent blood test results.  Plaintiff reported feeling much better and sleeping at night, and had started physical therapy.  Plaintiff indicated she still had depression and shoulder pain.  A physical examination indicated Plaintiff had a normal gait and posture and was cooperative, but depressed.  Dr. Lautenschlager continued Amitriptyline.  (Tr. 204-05.)

On March 24, 2005, Plaintiff visited Dr. Lautenschlager complaining of joint pain and depression.  Plaintiff reported that her pain control had improved, but worsened with weather changes.  Dr. Lautenschlager assessed Plaintiff with depressive disorder, postsurgical hypothyroidism, and right-shoulder pain.   He continued Amitriptyline, and added Cyclobenzaprine, Tramadol, and Piroxicam, and scheduled Plaintiff for a two-month follow-up. (Tr. 201-03.)

On July 5, 2005, Dr. Lautenschlager examined Plaintiff regarding her complaints about a variety of side effects from the medication she was taking, including swollen fingers in the morning, dry mouth, constipation, drowsiness, gas, indigestion, heartburn, dizziness, headaches, ringing in the ears, blurred vision, weight gain, and memory loss.  Dr. Lautenschlager diagnosed shoulder pain, postsurgical hypothyroidism, depressive disorder, tobacco use disorder, atopic dermatitis, pain in the hand, and constipation.  (Tr. 197-98.)

On September 26, 2005, Plaintiff visited Virginia Reddy, M.D., an arthritis/rheumatology specialist, upon referral from Dr. Lautenschlager.  Dr. Reddy diagnosed carpal tunnel syndrome, degenerative joint disease at multiple sites, and ulnar neuropathy.   She prescribed a nerve conduction study of Plaintiff's right arm.  (Tr. 188-90.)

On November 28, 2005, Dr. Lautenschlager examined Plaintiff for joint pain in her

right hand.  Plaintiff reported having difficulty typing at her normal rate, because of symptoms in her right hand and arm.  Plaintiff indicated her other symptoms had improved.  She also reported tricyclic therapy presented "some disturbing side effects."  Plaintiff reported that morning stiffness and stiffness after use of her hands associated with swelling still persisted.  Dr. Lautenschlager diagnosed Plaintiff with shoulder and hand pain, postsurgical hypothyroidism, and paresthesias[3] in her right hand.  (Tr. 194-96.)

On November 28, 2005, Dr. Lautenschlager wrote a letter, addressed "To Whom it May Concern," indicating that he recommended that Plaintiff apply for temporary disability status because of her medical condition, which "caused severe limitation in performance of her work and led to her need for frequent visits to medical care professionals."   Dr. Lautenschlager indicated that Plaintiff's long-term prognosis was "unknown."  (Tr. 187.)

On December 11, 2005, Plaintiff completed a pain questionnaire for the state disability agency.  She reported she suffered from daily and weather-dependent pain in her right shoulder, lower-back, tailbone, joints and fingers, and across the back of her neck and shoulders.  She reported the pain began three years earlier and had grown worse.  Plaintiff indicated she noticed deterioration in her typing skills from 70 words per minute to 38 words per minute.  She also indicated the pain prevented her from sitting for long periods of time, standing, typing, writing, and spending long amounts of time in front of the computer.  (Tr. 193.)

On February 17, 2006, Plaintiff visited Dr. Lautenschlager regarding her complaints of joint pain, depression, daily swelling in her right hand, constipation, and arthritis.  Plaintiff reported her Tramadol prescription was no longer adequately controlling the pain.  Plaintiff also reported she had gotten a job, but could not keep it.  Dr. Lautenschlager diagnosed postsurgical

---

[3] Paresthesias is an abnormal sensation such as burning, prickling, tickling, or tingling.
*Stedman's Medical Dictionary* 1316 (27th ed., 2000).

hypothyroidism, joint pain in the right hand and shoulder, constipation, and depressive disorder. He prescribed medication and referred Plaintiff to a rheumatologist.  (Tr. 214-17.)

On February 24, 2006, Dr. Lautenschlager diagnosed Plaintiff with joint pain in her shoulder and hand, depressive disorder, constipation, tobacco use disorder, and postsurgical hypothyroidism.  Dr. Lautenschlager noted Plaintiff had not gone for a nerve study and referred her again to a neurologist for this study and for advice for further evaluation.  (Tr. 220-22.)

On March 9, 2006, psychologist Thomas Davant Johns, Ph.D., examined Plaintiff and prepared a psychological evaluation.  Dr. Johns diagnosed Plaintiff with major depressive disorder, single episode, with some benefit from treatment; and pain disorder associated with psychological factors and general medical conditions.  Dr. Johns opined that Plaintiff's "ability to complete even simple tasks" efficiently over a sustained period of time was "markedly impaired" due to depression and chronic pain.  Dr. Johns assessed Plaintiff with a Global Assessment Functioning Score ("GAF") of 55.[4]   In his prognosis, Dr. Johns noted Plaintiff had indicated she was not presently being treated psychiatrically for depression and had not sought treatment in six months.  Dr. Johns opined that Plaintiff's prognosis was "guarded" and might be "somewhat better" if she had psychiatric treatment for depression as well as treatment for chronic pain.  (Tr. 181-86.)

On June 23, 2006, Plaintiff saw Dr. Lautenschlager for a routine visit.  She complained of chronic pain and depression.  She reported she was unable to hold two jobs, and had not been taking her Amitriptyline on an irregular basis because she thought it was a regular sleeping pill.

---

[4] A GAF reports the clinician's judgment of an individual's overall ability to function.  On the GAF scale, a score from 51 to 60 represents moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed. 2000).

Plaintiff also reported she did not get the neurology tests done because she did not know she had to pay $75.00 "up front."  (Tr. 281.)

On August 3, 2006, Esther Scharf, a licensed clinical social worker with Jewish Family and Children's Services ("JF&CS"), completed an initial counseling assessment regarding Plaintiff.  Ms. Scharf diagnosed Plaintiff with depression NOS and a GAF score of 50.  (Tr. 505-07.)

On December 21, 2006, Plaintiff was seen for follow-up regarding her right shoulder. She reported her pain level was "ten out of ten" and was given a prescription for Darvocet.  (Tr. 223.)

On February 12, 2007, Plaintiff visited JF&CF for mental health treatment.  She reported the Cymbalta had helped since her last visit and her depression had decreased from a ten out of ten to a seven out of ten, with ten being the worst.  (Tr. 296.)

On February 7, 2007, an MRI of Plaintiff's right shoulder showed an intrasubstance tear of the supraspinatus tendon at its attachment with the humerus, an impingement upon the supraspinatus muscle that was secondary to degenerative changes within the joint, and a small para-labral cyst.  (Tr. 179.)

At a March 12, 2007 visit to JF&CS Plaintiff reported she was not sleeping well because of back spasms and rotator cuff pain.  She again rated her depression as a seven out of ten.  (Tr. 295.)

On May 11, 2007, Plaintiff was examined by Dr. Lyndon Gross at NCCHC for an evaluation of her right shoulder.  Dr. Gross diagnosed right shoulder cuff tendinitis and an impingement, noted nonoperative management was failing to help, and recommended surgical intervention.  (Tr. 250-51.)  On May 21, 2007, which is after Plaintiff's current alleged onset

11

date, Plaintiff visited Dr. Lautenschlager complaining of severe pain in her tailbone and lower back, depression, and joint pain.  She also requested that she be tested for diabetes because she was healing slowly and bruising easily.  Dr. Lautenschlager diagnosed pain in her shoulder, depressive disorder, tobacco use disorder, and hypothyroidism.  (Tr. 269-70.)

On May 22, 2007, Dr. Gross performed right shoulder arthroscopic surgery, repair of anterior superior labral tear, and arthroscopic subacromial decompression.  (Tr. 238-39.)   At a June 8, 2007 follow-up examination, Dr. Gross told Plaintiff to discontinue use of a sling and "work aggressively on regaining range of motion and strength of her shoulder" in physical therapy.  (Tr. 249.)  At a July 6, 2007 follow-up appointment, Dr. Gross noted Plaintiff was progressing after surgery.  Plaintiff reported soreness in her shoulder that Dr. Gross noted may be related to her activities in physical therapy.  Plaintiff also reported numbness in her fingers and Dr. Gross determined that this should be observed for six weeks and then evaluated further if it became more symptomatic.  (Tr. 247-48.)

On July 24, 2007, Plaintiff saw Shirley Marshall, M.D., at NCCHC, regarding complaints of neck, back, and right shoulder pain.  Dr. Marshall observed shoulder pain with range of motion, pain with walking, and a slow gait.  She diagnosed joint pain involving the shoulder region and postsurgical hypothyroidism.  Dr. Marshall discontinued Plaintiff's prescription for Oxycodone-acetaminophen, replaced Gabapentin with Lyrica for chronic pain, and prescribed Oxycodone HCl.  (Tr. 359-61.)

On July 26, 2007, Plaintiff visited JF&CS.  She reported that Cymbalta helped with her depression, but she felt Ambien was not working as well and requested an alternative medication.  Her prescriptions for Cymbalta and Ambien were continued and a prescription for Trazadone was added.  (Tr. 294.)

On her August 16, 2007 visit to JF&CS, Plaintiff reported that she felt "antsy" and was "tired of fighting."  Plaintiff complained that she was about to lose her home and was having crying spells and insomnia.  Plaintiff's Cymbalta was discontinued and Celexa and Klonopin were prescribed.  Plaintiff was advised to call 911 or go to the nearest hospital for safety purposes if she was unable to contact JF&CS.  (Tr. 292.)

On August 17, 2007, Plaintiff saw Dr. Gross for follow-up regarding her right shoulder and numbness in her right hand.  Plaintiff reported improvement in her shoulder, but stated she still experienced numbness in two of her fingers.  Dr. Gross recommended an electromyogram ("EMG") to rule out any cervical radiculopathy, peripheral neuropathy, or nerve entrapment.  He noted Plaintiff needed no further management at that point with regards to her shoulder.  (Tr. 245-46.)

On August 24, 2007, Plaintiff saw Neesha Kurian, M.D., at NCCHC with complaints of depression and back, neck, and shoulder pain.  Plaintiff reported that she was off Cymbalta due to its expense and did not feel her other medication (she did not know the name) was helping.  Dr. Kurian observed that Plaintiff was depressed and in acute distress secondary to pain elicited by movement.  She diagnosed joint pain involving the right shoulder region, and depressive disorder.  Dr. Kurian prescribed Oxycodone HCI for Plaintiff's pain.  (Tr. 364-67.)

X-rays dated September 19, 2007, showed degenerative disease of the lumbar spine.  (Tr. 288.)  On September 21, 2007, Plaintiff visited Dr. Gross and complained of shoulder pain and numbness in two fingers.  Dr. Gross noted that Plaintiff's shoulder had improved overall and noted the results of Plaintiff's EMG study indicated possible positive lower cervical radiculopathy.  Gross referred Plaintiff for an orthopedic evaluation.  (Tr. 241-42.)

On October 12, 2007, Plaintiff went for an annual examination with Dr. Kurian.  Plaintiff reported that she had chronic pain, headaches, hot flashes, leg pain, and mood swings.  Dr. Kurian diagnosed constipation, mixed hyperlipidemia, and esophageal reflux, and prescribed medication for each condition.  (Tr. 374-78.)

On October 18, 2007, Plaintiff visited JF&CS and reported there was a family feud and her father was now in a nursing home after being hospitalized with pneumonia.  She also reported her depression was about the same with more ups and downs.   Plaintiff's Celexa was increased and her Klonopin was continued.  (Tr. 290.)  On November 8, 2007, Plaintiff reported her depression was about the same and she was sleeping well.  She also reported she was unsure whether her medications were working.  Her prescriptions were continued.  (Tr. 339.)

On November 12, 2007, Plaintiff visited Dr. Kurian for evaluation regarding the pain in her neck and right arm.  Upon examination of the cervical spine, Dr. Kurian found that Plaintiff was not showing positive physical examination findings consistent with radiculopathy.  Dr. Kurian noted Plaintiff's x-rays demonstrated "reasonably age-appropriate degenerative changes," and diagnosed Plaintiff with mechanical neck pain and history of mild cervical radiculopathy into the right upper extremity.  Dr. Kurian recommended cervical traction, and prescribed Daypro.  (Tr. 329-31.)

On November 15, 2007, Ms. Scharf completed a quarterly assessment of Plaintiff.  Ms. Scharf noted Plaintiff reported her son was living with his father and not speaking to her because of her continuing relationship with an abusive man.  Plaintiff told Ms. Scharf she was going to MERS four days per week looking for a job.  Ms. Scharf reported depression, anxiety, difficulties with activities of daily living, and inability to work.  She wrote that Plaintiff was "working through many traumatic memories including sexual abuse, and death of a son."  Ms.

14

Scharf diagnosed depressive disorder NOS and a GAF of 52.  Ms. Scharf noted that Plaintiff was currently prescribed Levothyroxine, Clonazapam, Citalopram, Lyrica, Prilosec, Simvastatin, Buspar, Enulose Syrup, Oxaprozin, Lyrica, and Celexa.  (Tr. 298-300.)

On November 28, 2007, Plaintiff visited St. Louis Connect Care with complaints of lower back and tail bone pain.  Plaintiff reported that she was not taking any pain medication, but stated she was in constant pain and it was hard to get up after sitting.  Plaintiff also complained of sharp pains down her legs and that it was hard for her to sleep.  (Tr. 323.)

On December 4, 2007, non-examining state agency consulting psychologist Kyle DeVore, Ph.D., completed a Psychiatric Review Technique Form and a mental Residual Functional Capacity ("RFC") assessment based upon his review of JF&CS records.  DeVore diagnosed Plaintiff with depressive syndrome characterized by anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, and difficulty concentrating or thinking.  Dr. DeVore indicated in check-box format that Plaintiff had mild limitation in her ability to maintain concentration, persistence, or pace; and moderate limitation in activities of daily living and maintaining social functioning.   Dr. DeVore opined that Plaintiff was "markedly limited" in her ability to understand, remember, and carry out detailed instructions.  Additionally, Dr. DeVore found she was "moderately limited" in her ability to work in coordination with or proximity to others without being distracted by them.  She was also "moderately limited" in three of the five areas of social interaction including the following: (1) interacting appropriately with the general public; (2) accepting instructions and responding appropriately to criticism from supervisors; and (3) getting along with coworkers or peers without distracting them or exhibiting behavioral extremes.  Further, Plaintiff was "moderately limited" in her ability to both respond appropriately to changes in the work setting

15

and to set realistic goals or make plans independently of others.  Dr. DeVore concluded Plaintiff could follow simple instructions and make basic work-related decisions.  Further, he concluded, she could relate adequately to peers and supervisors and adapt to routine changes in a work environment.  (Tr. 303-16.)

On December 5, 2007, Suzanne Page, a non-medical state agency consultant, completed a physical RFC assessment regarding Plaintiff.  Page opined that Plaintiff had no limitations pushing or pulling, could occasionally lift 20 pounds, frequently lift ten pounds, and could stand, sit, or walk about six hours in an eight-hour workday with normal breaks.  Page found that Plaintiff had no established postural, visual, communicative, or environmental limitations.   (Tr. 317-22.)

On December 31, 2007, Plaintiff visited JF&CS.  Plaintiff reported that her depression was worse, because of the holidays, but her eating and sleeping habits were fair.  Plaintiff's prescriptions were adjusted and continued.  (Tr. 340.)

On January 11, 2008, Plaintiff visited Dr. Kurian for a follow-up regarding X-rays taken at her last visit.  Dr. Kurian noted Plaintiff had full range of motion in all joints, but that range of motion in her spine was decreased and movement was painful.  Dr. Kurian assessed Plaintiff with pain in joint involving shoulder region, mixed hyperlipidemia, esophageal reflux, constipation, depressive disorder not elsewhere classified, postsurgical hypothyroidism, and degeneration of cervical intervertebral disc.  (Tr. 387-90.)

On January 14, 2008, Plaintiff saw orthopedic surgeon Howard Place, M.D., for a follow-up regarding her upper extremity symptoms.  Plaintiff reported improvement since her last visit, though she continued to have pain in her upper neck and between her shoulder blades.  Dr. Place found no evidence of myelopathy.  He diagnosed (1) cervical spondylosis with improvement of

16

upper extremity radiculopathy, (2) status post right shoulder rotator cuff repair with some residual symptoms that were "certainly not severe"; and (3) right dorsal forearm pain most likely related to posterior interosseous nerve irritation in the dorsal forearm.  Dr. Place noted that Plaintiff would continue to take Daypro.  X-rays of Plaintiff's cervical spine showed spondylosis, with moderate degenerate change from the exam done on November 12, 2007. There was no evidence of fracture or subluxation.  (Tr. 333-35.)

At a January 17, 2008 visit to JF&CS Plaintiff reported her depression was at about the same level.  She reported that she took her medications regularly, but had not noticed much of a difference.  Plaintiff reported her sleep and appetite were poor.  Wellbutrin was added to Plaintiff's prescriptions.  (Tr. 341.)  On February 14, 2008, Plaintiff reported she did not think she was getting better and her anxiety and depression were about the same.  Plaintiff's prescriptions were adjusted slightly.  (Tr. 342.)

On February 26, 2008, Plaintiff was given a lumbar epidural steroid injection at L5-S1 under fluoroscopy.   Plaintiff was undergoing the procedure for low back pain with significant right lower extremity pain and parasthesias.  Plaintiff was discharged in stable condition and advised the procedure may be repeated four weeks later.  (Tr. 336.)

On March 13, 2008, Plaintiff visited JF&CS and reported she was only sleeping four hours at night, but her therapy was going well.  Plaintiff's prescriptions remained the same.  (Tr. 343.)

On April 21, 2008, Plaintiff was given a lumbar transforaminal epidural steroid injection (selective nerve root injection) at bilateral L3-4 and L4-5 for ongoing bilateral lower extremity pain.  There were no apparent complications and Plaintiff was referred to physical therapy.  (Tr. 337-38.)

On May 1, 2008, Plaintiff visited JF&CS and reported she was still having issues with her son and other family members.  Plaintiff's medications were continued.  (Tr. 344.)

On May 9, 2008, Plaintiff visited Dr. Kurian for a follow-up appointment.  Plaintiff reported she was taking pain medication every six hours for pain in her back, neck, elbow, and wrist.  (Tr. 398-400.)

On May 22, 2008, Plaintiff called JF&CS to request medication to "calm her nerves." Plaintiff reported her father had passed away and she was afraid to attend his funeral and "face her demons."  Plaintiff's prescription for Klonopin was increased.  (Tr. 346.)   On June 19, 2008, Plaintiff reported that she was feeling less anxious, but in general her depression was still the same.  Plaintiff's medications were adjusted slightly.  (Tr. 347.)

On August 4, 2008, Plaintiff visited Dr. Kurian and reported her back pain had worsened the last few months and the Darvocet was not giving her any relief.  She also reported the injection she received previously helped for approximately two weeks.  (Tr. 403.)

On September 4, 2008, Ms. Scharf completed a Mental RFC Questionnaire regarding Plaintiff.  Ms. Scharf indicated that she met with Plaintiff weekly from July 27, 2006, to the date the questionnaire was completed.  Ms. Scharf assessed Plaintiff with a GAF of 54.  Ms. Scharf noted that Plaintiff had fifteen prescriptions for medication, with the following possible side effects: lightheadedness, upset stomach, insomnia, dizziness, drowsiness, fatigue, and poor concentration.  Ms. Scharf indicated Plaintiff could not complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; or accept instructions and respond appropriately to criticism from supervisors.   Ms. Scharf also indicated that Plaintiff could not independently, appropriately, or effectively and on a sustained basis (1) remember work related

procedures, (2) maintain attention for a two-hour segment, (3) sustain an ordinary routine

without special supervision, (4) make simple work related decisions, or (5) deal with normal

work stress.  Ms. Scharf noted Plaintiff could not deal with stress of semiskilled or skilled work

in a regular work setting, and Plaintiff could not satisfactorily understand and remember detailed

directions, carry out detailed directions, or set realistic goals or make plans independently of

others, appropriately, effectively on a sustained basis in a regular work setting.  Ms. Scharf also

noted Plaintiff would be unable to interact appropriately with the general public, travel in

unfamiliar places, or use public transportation.  Ms. Scharf opined Plaintiff would have to miss

three days of work per month due to her impairments or treatments.  Ms. Scharf indicated

Plaintiff was not a malingerer, and assessed Plaintiff would be unable to sustain work level of

energy and mood now or in the future.  (Tr. 348-52.)

On November 13, 2008, Ms. Scharf completed a semi-annual assessment regarding

Plaintiff.  Ms. Scharf diagnosed Plaintiff with major depression disorder and generalized anxiety

disorder with a GAF of 54.  Ms. Scharf indicated Plaintiff had chronic mental illness and poor

quality of life.  Ms. Scharf noted Plaintiff had ten current prescriptions (Levothyroxine,

Clonazapam, Citalopram, Lyrica, Prilosec, Simvastatin, Buspar, Enulose Syrup, Baclofen, and

Oxycodone).  (Tr. 455-57.)

On December 16, 2008, Plaintiff visited Dr. Kurian and reported that she needed

medication refills and complained of right arm pain and knee pain, which Plaintiff said was a ten

out of ten.  Dr. Kurian determined Plaintiff's range of motion was decreased in all joints and all

movements were painful.  Dr. Kurian diagnosed Plaintiff with pain in joint involving pelvic

region and thigh, degeneration of cervical intervertebral disc, mixed hyperlipidemia, postsurgical

hypothyroidism, and esophageal reflux.  Dr. Kurian encouraged Plaintiff to do regular physical

therapy exercises especially during the winter and referred her to an orthopedic specialist.  (Tr. 477-79.)

On January 16, 2009, Plaintiff visited JF&CS, reporting her depression was the same, but she was hurting because it was cold outside.  Plaintiff denied any suicidal or homicidal ideation. She reported that her medications were working for her and she did not want any changes. Plaintiff also indicated her sleep and energy were "ok" most days.  Current medications were continued.  (Tr. 458.)  On February 27, 2009, Plaintiff complained of frequent crying spells and insomnia.  She reported her back pain was intermittent and her energy and concentration were okay.  Current medications were again continued.  (Tr. 459.)  On March 27, 2009, Plaintiff expressed anger at the doctor for not calling in her medication and not helping her.  She denied any suicidal or homicidal ideation, and medications were continued as prescribed.  (Tr. 461.)

On March 31, 2009, Plaintiff reported a course of increased pain over the course of several years, describing the pain as "a severe dull aching" in the shoulder, elbow, and knees. Physical examination by Felicia Brown, M.D., showed no acute distress, normal posture, and gait, full range of motion of the neck, and painful movement of elbows and knees, bilaterally.  X-rays conducted of Plaintiff's knees on April 2, 2009, were negative, showing there was no fracture or dislocation or evidence of joint effusion.  (Tr. 491-94.)

On April 28, 2009, Plaintiff visited Dr. Kurian.  Plaintiff reported that she was told by the orthopedics department that her neck problem caused the swelling in her hands and she was trying to walk more to lose weight.  Dr. Kurian noted that Plaintiff's spinal movements were painful, right shoulder movements were painful with a decreased range of motion, and bilateral knee movements were painful without a decrease in range of motion.  (Tr. 520-25.)

On May 8, 2009, Plaintiff visited JF&CS and complained of not sleeping well in four months.  Plaintiff's medications were continued as prescribed.  (Tr. 517.)

On May 9, 2009, Plaintiff went to the emergency room for a fractured left ankle due to a fall.  (Tr. 546-47.)  On May 13, 2009, surgery was recommended and Plaintiff was placed in a short leg cast. (Tr. 575-76.)  Surgery on the left ankle was performed on May 27, 2009, and Plaintiff was discharged from the hospital the next day with instructions to keep her left leg elevated and iced, keep her splint clean and dry, and not to place weight on her left leg.  (Tr. 625-36.)  Post-surgical visits on June 3 and 17, 2011, showed Plaintiff was doing well.  The plan was to transition her to a "MOON boot" in three weeks.  (Tr. 675-70.)

## II.       ALJ'S DECISION OF OCTOBER 9, 2009 (Tr. 11-20)

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010, and that she had not engaged in any substantial gainful activity since May 18, 2007, the alleged disability onset date.  The ALJ determined that Plaintiff had the following severe impairments: spinal disorder, an affective mood disorder, and the residual effects of right shoulder surgery and left ankle surgery.  The ALJ concluded, however, that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the deemed-disabling impairments listed in the Commissioner's regulations.

With respect to Plaintiff's musculoskeletal impairments, the residual effects of Plaintiff's right shoulder and left ankle surgery, the ALJ found no evidence that these impairments prevented Plaintiff from being able to ambulate effectively or from performing fine and gross movements as defined in the Commissioner's regulations.  The ALJ also found no evidence that Plaintiff's spinal disorder involved nerve root compression, spinal arachnoiditis or lumbar stenosis so as to prevent her from ambulating effectively.

21

With respect to Plaintiff's mental impairments, the ALJ found that neither the paragraph B nor paragraph C criteria were satisfied; and found that Plaintiff had only moderate restriction in activities of daily living.  Specifically, the ALJ found that Plaintiff was able to do laundry, fold clothes and put them away, make her bed, prepare meals, wash dishes, and use the computer.  Plaintiff also drove in her community and could handle money.  The ALJ then found that Plaintiff had moderate difficulty with social functioning, mild difficulty with concentration, persistence, or pace, and had experienced no episodes of decompensation.

The ALJ then found that Plaintiff had the RFC to perform light work as defined in the regulations, with the exception that she could not reach with the right arm in any direction on a frequent basis and could do no overhead lifting with the right arm.  The ALJ further determined that Plaintiff could understand, remember, and carry out at least simple instructions and non-detailed tasks; demonstrate adequate judgment to make simple work-related decisions; and perform work at a normal pace without production quotas.

Citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the ALJ found the preponderance of the medical and other evidence inconsistent with Plaintiff's allegation of disability.  Specifically, the ALJ found Plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain and other symptoms unsubstantiated by the objective medial evidence and not credible to the extent they were inconsistent with the RFC.  The ALJ found Plaintiff had neither a long nor a steady work record up to her alleged onset of disability, and noted that while the decision to work, or to work part-time, is one's prerogative, it does not support a finding of disability, suggests a lack of motivation to work and raises questions about whether she was currently unemployed due to factors other than her medical problems.  The ALJ found no evidence that Plaintiff's treating physicians found her current medications inadequate

or in need of significant adjustment.  The ALJ further found the medical and other evidence inconsistent with Plaintiff's allegedly limited daily activities.

With respect to Plaintiff's history of psychiatric treatment for depression, the ALJ gave "some weight" to the reports of Plaintiff's treating therapist, Esther Scharf, LCSW, finding that Plaintiff generally had a normal or almost normal mental status exam; a GAF score above 51, signifying symptoms of mild to moderate severity; and a generally favorable response to medication.  The ALJ discounted Ms. Scharf's September 4, 2008 report describing Plaintiff's psychiatric limitations as more severe, finding the conclusions in that report inconsistent with the evidence as a whole and with Ms. Scharf's own treatment records.  Because he found it generally consistent with the evidence on the record, the ALJ gave significant weight to the assessment of the State Agency medical source, Kyle DeVore, Ph.D., finding Plaintiff's depression moderately limiting but not totally disabling.

With respect to Plaintiff's musculoskeletal limitations, the ALJ discounted the opinions of Plaintiff's treating physician, John Lautenschlager, M.D.  Citing *Hofslien* v. *Barnhart*, 439 F.3d 375 (7th Cir. 2006), the ALJ noted that Dr. Lautenschlager, "might be sympathetic to" Plaintiff and that he failed to build a bridge between his conclusions regarding work-related limitations and his medical findings.  The ALJ found no evidence that Plaintiff would be severely limited by the residual effects of her recent ankle surgery but noted that the RFC included limitations taking this condition onto account.

The ALJ then found that Plaintiff was unable to perform any past relevant work, as her former positions exceeded his RFC finding that Plaintiff was able to perform light work with limitations.  Having noted that Plaintiff's additional limitations affected her ability to perform all or substantially all of the requirements of light work, the ALJ looked to the VE's testimony to

determine the extent to which Plaintiff's limitations would "erode the unskilled light occupational base." The ALJ noted the VE's testimony that an individual of Plaintiff's age, education, work experience, and RFC would be able to perform the representative requirements of such jobs as school bus monitor, sandwich board carrier, and parking lot attendant, and that there were approximately 350,000 such jobs in the national economy and 4,000 such jobs in the state of Missouri. On the basis of this testimony the ALJ found that a significant number of jobs exist in the national and local economies that Plaintiff could perform. Thus the ALJ concluded that Plaintiff has not been under a disability, as defined by the Social Security Act, from May 18, 2007, through the date of the ALJ's decision.

### III.   EVIDENCE SUBMITTED TO THE APPEALS COUNCIL

On July 16, 2009, Plaintiff visited JF&CS, reporting she was stressed and tired. Plaintiff also reported she was doing well on her medications (Wellbutrin, Celexa, Buspar, Clorozapam, and Trazadone) and they were continued. (Tr. 685.)

On July 29, 2009, Plaintiff visited David Kieffer, M.D., at NCCHC to review an MRI and follow up on right arm, back, and spine pain. Dr. Kieffer noted the MRI showed mild spondylosis and mild stenosis, normal discs, and no nerve impingement. He noted a slightly decreased range of motion of the cervical spine and intact sensation, recommended regular exercise, and prescribed Darvocet and Naproxen. (Tr. 699.)

On August 6, 2009, Ms. Scharf completed another semi-annual assessment for Plaintiff. Ms. Scharf again diagnosed Plaintiff with major depression disorder, recurrent and moderate; generalized anxiety disorder; and a GAF score of 54. Ms. Scharf noted Plaintiff had chronic mental illness as well as physical disability. (Tr. 687-89.)

On September 4, 2009, Plaintiff visited JF&CS and reported her Trazadone was helping and she was staying asleep.  Plaintiff's current medications were continued.  (Tr. 695.)

On September 21, 2009, Plaintiff visited Dr. Kurian and asked for more pain medication because she had flushed medications she had down the toilet.  Dr. Kurian noted concern, because Plaintiff seemed groggy and had a history of depression.  Plaintiff reported that her grogginess was from her depression and "psych meds."  Plaintiff denied suicidal or homicidal ideations.  Plaintiff complained that her pain was worse on the right side of her body.  Dr. Kurian noted that she informed Plaintiff that she was uncomfortable prescribing narcotics as Plaintiff was sedated and groggy and narcotics did not seem to help with her pain.  Dr. Kurian noted she contacted JF&CS and "Dr. Ibrahim" regarding Plaintiff's number of prescriptions, including two types of Wellbutrin.  Dr. Kurian noted Dr. Ibrahim contacted her and stated that he was unaware that Plaintiff had other bottles of Wellbutrin.  (Tr. 709-10.)

In a letter dated November 5, 2009, Ms. Scharf stated Plaintiff had been her patient for over three years and that Plaintiff suffered from post-traumatic stress disorder, depression, and chronic debilitating pain.  (Tr. 716.)  In a letter dated November 16, 2009, A. Ibrahim, M.D., wrote that Plaintiff had been under the care of the Department of Psychiatry of SLUCare for more than a year and that she had "a significant disability from her mental illnesses" -- major depression, recurrent; and post-traumatic stress disorder.  (Tr. 714.)

The Appeals Council denied Plaintiff's request for review, stating the new information she had submitted was about a time after the ALJ's decision and thus did not affect the decision as to whether she was disabled as of October 6, 2009, the date of the decision.  (Tr. at 2.)

# IV.     LEGAL STANDARD

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled.  20 C.F.R. §§ 416.920, 404.1520.  "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'"  *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).  In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits.  20 C.F.R. §§ 416.920(b), 404.1520(b).  Second, the claimant must have a severe impairment.  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …."  20 C.F.R. §§ 416.920(a) (iii), 404.1520(a) (iii).   "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work."  *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001)).

Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the Regulations at 20 C.F.R. §§ 416.920(a) (iii), 404.1520(a) (iii).  If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history.  20 C.F.R. §§ 416.920(a) (iii), 404.1520(a)(iii).

Fourth, the impairment must prevent claimant from doing past relevant work.[5]  20 C.F.R. § 404.1520(e).  At this step, the burden rests with the claimant to establish his or her RFC.  *Steed v. Astrue*, 524 F.3d 872, 874 n.3 (8th Cir. 2008); *Eichelberger*, 390 F.3d at 590-91; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  RFC is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b)-(e).  The ALJ will review a claimant's RFC and the physical and mental demands of the work the claimant has done in the past.  20 C.F.R. § 404.1520(f).  If it is found that the claimant can still perform past relevant work, the claimant will not be found to be disabled.  *Id.*; 20 C.F.R. § 416.920(a)(4)(iv).  If the claimant cannot perform past relevant work, the analysis proceeds to Step V.

At the fifth and last step, the ALJ considers the claimant's RFC, age, education, and work experience to see if the claimant can make an adjustment to other work.  20 C.F.R. § 416.920(a)(4)(v).  If it is found that the claimant cannot make an adjustment to other work, the claimant will be found to be disabled.  *Id. See also* 20 C.F.R. § 416.920(g).  At this step, the Commissioner bears the burden to "prove, first that the claimant retains the RFC to perform other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform."  *Goff*, 421 F.3d at 790; *Nevland v. Apfel*, 204 F.3d 853, 858  (8th Cir. 2000).  The Commissioner must prove this by substantial evidence.  *Warner v. Heckler*, 722 F.2d 428, 431 (8th Cir. 1983).

---

[5]  "Past relevant work is work that [the claimant] has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn how to do it." *Mueller v. Astrue*, 561 F.3d 837, 841 (8th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1560(b)(1)).

If the claimant satisfies all of the criteria of the five-step sequential evaluation process, the ALJ will find the claimant to be disabled.  The ultimate burden of persuasion to prove disability remains with the claimant.  *See  Harris v. Barnhart*, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003)).

This court reviews the decision of the ALJ to determine whether the decision is supported by "substantial evidence" in the record as a whole.  *See Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). *See also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).  Therefore, even if a court finds that there is a preponderance of the evidence against the ALJ's decision, the ALJ's decision must be affirmed if it is supported by substantial evidence. *Krogmeier*, 294 F.3d at 1022.  In *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or  deny benefits without being subject to reversal on appeal.

Similarly, the ALJ decision may not be reversed because the reviewing court would have decided the case differently. *Krogmeier*, 294 F.3d at 1022.

It is not the job of the district court to re-weigh the evidence or review the factual record de novo.  *Cox*, 495 F.3d at 617; *Guillams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Weighing the evidence is a function of the ALJ, who is the fact-finder. *Masterson v. Barnhart*, 363 F.3d 731, 736 (8th Cir. 2004).  The factual findings of the ALJ are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g).  The district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it

adequate to support the ALJ's conclusion.  *Davis v. Apfel*, 239 F.3d 962, 966 (8th Cir. 2001)

(citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)).

To determine whether the Commissioner's final decision is supported by substantial

evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

*Brand v. Sec'y of Dept. of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980); *Cruse v.

Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989).  Additionally, an ALJ's decision must comply

"with the relevant legal requirements."  *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008).

The Social Security Act defines disability as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically

determinable physical or mental impairment, direct medical evidence of the cause and effect

relationship between the impairment and the degree of claimant's subjective complaints need not

be produced."  *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  A claimant's subjective

complaints may not be disregarded solely because the objective medical evidence does not fully support them. *Id.* The absence of objective medical evidence is just one factor to be considered in evaluating the claimant's credibility and complaints. *Id.* The ALJ must fully consider all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions

*Id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the claimant's complaints. *Guillams*, 393 F.3d at 802; *Masterson*, 363 F.3d at 738. "It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence." *Id.* (citing *Butler v. Sec'y of Health & Human Servs.*, 850 F.2d 425, 429 (8th Cir. 1988)). The ALJ, however, "need not explicitly discuss each *Polaski* factor." *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). *See also Steed*, 524 F.3d at 876 (citing *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). The ALJ need only acknowledge and consider those factors. *Id.* Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. *Rautio v. Bowen*, 862 F.2d 176, 179 (8th Cir. 1988).

"In cases involving the submission of supplemental evidence subsequent to the ALJ's decision, the record includes that evidence submitted after the hearing and considered by the

Appeals Council." *Bergmann v. Apfel*, 207 F.3d 1065, 1068 (8th Cir. 2000) (citing *Jenkins v. Apfel*, 196 F.3d 922, 924 (8th Cir. 1999). "In such a situation, "[a] court's role is to determine whether the ALJ's decision 'is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made.'" *Id.* (citing *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994)). "In practice, this requires [a] court to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." *Id.* (citing *Riley*, 18 F.3d at 622). Thus, the appropriate inquiry is not whether the Appeals Council erred, but whether the record as a whole supports the decision of the ALJ. *Perks v. Astrue*, 687 F.3d 1086,1091(8th Cir. 2012) (citing *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)).

## V.    DISCUSSION

Plaintiff contends the ALJ's RFC determination is not supported by "some" medical evidence as required by the Eighth Circuit's opinions in *Singh v. Apfel,* 222 F.3d 448 (8th Cir. 2000), and *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001).   As a result of this deficiency, Plaintiff further asserts that the hypothetical questions posed to the VE failed to include all the effects of Plaintiff's impairments; and therefore, that the VE's responses do not constitute substantial evidence.  The Commissioner contends the ALJ's RFC assessment is supported by the record as a whole and the ALJ properly relied upon the testimony of the VE in finding Plaintiff is not disabled.

The RFC is a function-by-function assessment of an individual's ability to do work related activities on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).  It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of his limitations.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).

Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, a claimant's RFC is a medical question. *Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001) (citing *Lauer*, 245 F.3d at 704). Therefore, an ALJ is required to consider at least some supporting evidence from a medical professional. *Lauer*, 245 F.3d at 704. An RFC determination made by an ALJ will be upheld if it is supported by substantial evidence in the record. *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff asserts that the ALJ improperly discounted Ms. Scharf's opinion and instead relied on the assessment of Dr. DeVore, a non-examining agency source, and also failed to mention why Dr. Johns' report was not considered.

In making a disability determination, the ALJ shall "always consider the medical opinions in [the] case record together with the rest of the relevant evidence [in the record.]" 20 C.F.R. § 404.1527(b); *see also Heino v. Astrue*, 578 F.3d 873, 879 (8th Cir. 2009). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). "It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if [the conclusions] are inconsistent with the record as a whole." *Id.*

The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is

a specialist in the area.  20 C.F.R. § 404.1527(d).   In *Lacroix v. Barnhart*, 465 F.3d 881 (8th Cir. 2006), the Eighth Circuit explained that opinions of therapists and nurse practitioners who comprised a claimant's mental-health treatment team were not entitled to greater weight than opinions of non-treating examining consultants, as therapists and nurses were not "acceptable medical sources" as defined by the regulations, 20 C.F.R. 20 C.F.R. § 404.1527(a).

The Eighth Circuit also has held that it does not consider "the opinions of non-examining, consulting physicians standing alone to be substantial evidence." *Harvey v. Barnhart*, 368 F.3d 1013, 1016 (8th Cir. 2004).  The ALJ may, however, rely on the consultant's opinion in the context of the entire record which as a whole provides substantial support for the consultant's findings. *Id.*  In this case, the Court concludes on the basis of its review of the administrative record that the ALJ's decision to accord significant weight to Dr. DeVore's assessment is not supported by substantial evidence in the record.  Dr. DeVore relied solely upon the evidence found in Ms. Scharf's treatment notes.  The ALJ found Ms. Scharf's own quarterly and semi-annual assessments inconsistent with her treatment notes, yet accorded Dr. DeVore's assessment premised on the very same treatment notes significant weight.  The Court is hardpressed to understand how Ms. Scharf's assessments are inconsistent with her treatment notes .

Furthermore, even if Dr. DeVore's assessment of Plaintiff's limitations is accepted, the ALJ's hypothetical question does not incorporate those restrictions.  Most notably, the ALJ failed to incorporate in the hypothetical any reference to his findings of moderate limitations in social functioning, which would include the ability to work in coordination with or proximity to others without being distracted by them, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to respond

appropriately to changes in the work setting.  *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012).  Remand is necessary because the ALJ relied on an improper hypothetical question posed to the ALJ.

The Court further concludes that the Appeals Council clearly erred in refusing to credit Dr. Ibrahim's letter of November 16, 2009, on the basis of the finding that the letter referred to Plaintiff's condition in the time period after the ALJ's decision.  Although Dr. Ibrahim's letter was dated five weeks after the ALJ's decision, according to his letter, his assessment covered a relevant time period beginning approximately one year after the date of Dr. DeVore's December 4, 2007 assessment.

In addition, the Court notes that the medical record in this case is extensive, but it does not appear to include the treatment notes from the year of psychiatric care referred to by Dr. Ibrahim.  Although it is possible that the notes relating to the care provided by JF&CS are Dr. Ibrahim's notes, the record does not clearly establish this fact and this will be a matter for the Commissioner to clarify on remand.

The Court also notes that although the ALJ need not have considered Dr. Johns' March 9, 2006 assessment because it occurred approximately 14 months before Plaintiff's alleged onset date of disability, May 18, 2007, that assessment is consistent with, and provides additional support for Ms. Scharf's and Dr. Ibrahim's opinions.  Taking this into account, it may be that on remand, the Commissioner will determine that obtaining the opinion of an examining medical expert may be necessary.

The Court finally notes with respect to Plaintiff's physical impairments, that the evidence on the record, in particular the many physical findings indicating only mild symptoms, arguably supports the ALJ's RFC.  Nonetheless, on remand in considering Plaintiff's RFC, the ALJ must

assess the combined effect of both her mental and physical impairments. *See* 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (when assessing an individual's RFC, the ALJ "must consider an individual's impairments in combination); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000) (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

### VI.     CONCLUSION

For the reasons set forth above, the Court concludes the Commissioner's decision that Plaintiff is not disabled is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** for further consideration consistent with this Memorandum and Order.

A separate Judgment shall accompany this Memorandum and Order

Dated this 28th day of September, 2012.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

35